WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Danny Musgrove, | ) | No. CV-12-0660-TUC-CRP |
| Petitioner, | ) | |
| vs. | ) | **ORDER** |
| Charles L. Ryan, et al., | ) | |
| Respondents. | ) | |

Petitioner, confined in the Arizona State Prison Complex, Florence, and represented by counsel, has filed a Petition Under 28 U.S.C. § 2254 For A Writ of Habeas Corpus By A Person In State Custody (Non-Death Penalty). (Doc. 1, Pet.). Respondents have filed an Answer to the Petition (Doc. 11, Answer). Petitioner has not filed a Reply. This case is before the Magistrate Judge based on the parties' consent to such jurisdiction. (Doc. 10, Order). For the foregoing reasons, the Court denies Petitioner's Petition for a Writ of Habeas Corpus.

////

////

## I. Factual and Procedural History

### A. Petitioner's Convictions and Sentences

Petitioner was convicted by a jury in the Superior Court of Pima County of one count of first degree murder, one count of conspiracy to commit first-degree murder, and two counts of endangerment. (Ex. A, *State v. Musgrove*, No. 2 CA-CR 2008-0294, Opinion (Ariz. App. Dec. 1, 2009); *State v. Musgrove*, 221 P.3d 43 (Ariz. App. Dec. 1, 2009)).[1] The charges stemmed from the shooting death of Michael Lopez on or about February 24, 2006. (Ex. C, No. 2 CA-CR 2008-0294, Appellee's Answering Br. at 1). The State's evidence showed that on the date of the shooting, Lopez got into a fight with Petitioner in the VFW parking lot in South Tucson and knocked out Petitioner. (*Id.*). Lopez returned home and about an hour later, Petitioner and a few others arrived at Lopez's home where Petitioner allegedly shot Lopez twice in the head, killing him. (*Id.*). Petitioner's blood and DNA evidence were found in the Lopez house. (*Id.*). Petitioner's cell mate, Floyd Lee, testified for the State that Petitioner confided in him that he shot Lopez:

> He told me that he was at the VFW night club on 36th and Park and he got into it with this guy, Michael Lopez. They bumped into one another. They exchanged words. They started fighting. Michael Lopez knocked Danny Musgrove out. Musgrove woke up from being knocked out and went to get a gun. Came back to the club, Michael Lopez was gone. He went to where Michael Lopez was and shot him several times.

(*Id.*, citing Ex. N, R/T 2/15/08 at 92-93).

The trial court sentenced Petitioner to concurrent terms of life imprisonment for the murder and conspiracy to commit murder and to two consecutive terms of 2.25 years' imprisonment on the endangerment convictions. (Ex. A, *Musgrove*, 221 P.3d at 45, ¶ 3). Petitioner appealed, raising several grounds, including that "tainted" and "fabricated" evidence was introduced at trial violating his right to a fair trial and due process of law. (*Id.*).

---

[1] Relevant portions of the state court record are attached as Exhibits A through I at Doc. 11, Exhibit L at Doc. 12, Exhibit N at Doc. 13, and Exhibits J, K, M and O though S at Doc. 16. Unless otherwise noted, the Court has cited to the state court record by exhibit number without the corresponding docket number assigned to Respondents' Answer.

- 2 -

The state appellate court found as to this ground that Petitioner had not sought relief from the trial court based on this allegation, the issue was forfeited, Petitioner had not argued fundamental error, and no fundamental error was found sua sponte. (*Id.*). The Arizona Court of Appeals affirmed Petitioner's convictions and sentences for first degree murder and the two counts of endangerment but vacated his conviction and sentence on the one count of conspiracy to commit murder. (*Id.* at 47, ¶ 13). Petitioner did not seek review in the Arizona Supreme Court. (Ex. D, Court of Appeals Mandate).

### B. Petitioner's State Post-Conviction Proceedings

While his direct appeal was pending, Petitioner proceeding pro se filed a Notice of Post-Conviction Relief ("PCR") on February 9, 2006. (Ex. E, PCR Notice). On September 29, 2010, Petitioner, represented by counsel, filed a Petition for Post-Conviction Relief ("PCR petition") in the trial court. (Ex. F, PCR Pet.). Petitioner asserted in the PCR Petition ineffective assistance of appellate and trial counsel. Petitioner contended that appellate counsel had provided ineffective assistance by failing to file a motion for new trial causing the fabricated evidence issue to be waived on appeal. (Ex. F, PCR Pet., at 5). The claim of fabricated evidence concerned (1) the placement of a bullet the police found at the crime scene and the subsequent report by the authorities that Petitioner's DNA was found on the bullet; and (2) crime scene photographs showed that the victim's body had been moved. (*Id.* at 6-10). Petitioner contended that trial counsel provided ineffective assistance by stipulating into evidence statements made by Lillian Pillow, that is, her video taped interview with the police, her recorded telephone calls from the Pima County Jail, and her free talk with the police. (*Id.* at 12-14). Petitioner requested an evidentiary hearing as to his claims. (*Id.* at 14). The State filed a Response asserting that Petitioner was not entitled to relief based on the grounds asserted. (Ex. G, Response to PCR Pet.).

On December 10, 2010, the state trial court issued a Ruling denying the PCR Petition. (Ex. H, 12/10/10 Ruling). Petitioner sought review in the Arizona Court of Appeals who granted review but denied relief. (Ex. I, No. 2 CA-CR 2011-0001-PR, Pet. for Review; Ex.

B, *State v. Musgrove*, No 2 CA-CR 2011-0001-PR, Mem. Decision, April 4, 2011).  The State Court of Appeals ruled that the trial court had not abused its discretion in denying the PCR Petition, that the trial court clearly and correctly addressed the merits of each claim, and that the trial court's ruling was "adopt[ed] ... [there was] no need to repeat the court's analysis here."  (Ex. B, *Musgrove*, Mem. Decision).  The Arizona Supreme Court subsequently denied Petitioner's request for review without comment on September 6, 2011. (Ex. J).

### C.     The Petition for Writ of Habeas Corpus

Petitioner filed his federal habeas petition on September 4, 2012. (Doc. 1)  Petitioner asserts the following grounds for relief:

(1)  Petitioner's due process rights were violated when appellate counsel provided ineffective assistance of counsel by failing to raise a motion for new trial based on fabricated evidence, that is, placement of the bullet, DNA collected from the bullet, and movement of the victim's body; U.S. Constitution Amendments 5, 6 and 14; *Strickland v. Washington*, 466 U.S. 668 (1984) (Pet. at 4, 14-20);

(2)  Petitioner's due process rights were violated when defense trial counsel introduced incriminating evidence, that is, the Lillian Pillow statements, against Petitioner at trial; U.S. Constitution Amendments 5, 6 and 14; *Strickland v. Washington*, 466 U.S. 668 (1984) (Pet. at 4, 20-24).

Petitioner requests an evidentiary hearing on his two grounds.  (*Id.* at 25-26).

## II.    ANALYSIS

### A.     Timeliness and Exhaustion

Petitioner contends that his federal habeas petition has been timely filed and that he has exhausted his state court remedies.  (Pet. at 5).  Respondents do not contend that the Petition is untimely or that Petitioner has not exhausted his claims.  Respondents argue that the grounds asserted are without merit and the federal habeas petition should denied and

- 4 -

1 dismissed with prejudice.  The Court, therefore, will proceed to a merits analysis of
2 Petitioner's grounds.

### B. Merits Analysis

#### 1. Standards of Review

To be eligible for federal habeas corpus relief, a state prisoner must establish that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  This Court's analysis of the merits of Petitioner's claims is constrained by the applicable standard of review.  A state prisoner "whose claim was adjudicated on the merits in state court is not entitled to relief in federal court unless he meets the requirements of 28 U.S.C. § 2254(d)." *Price v. Vincent,* 538 U.S. 634, 638 (2003).  The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") imposes a "highly deferential standard for evaluating state-court rulings," *Lindh v. Murphy*, 521 U.S. 320, 333 n. 7 (1997), and "demands that state court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curiam*).  Under AEDPA, this Court cannot grant habeas relief unless the state court decision was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or was (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1), (2).

Under § 2254(d)(1), a federal habeas court may not issue a writ, unless the state court decision was either: (1) "*contrary to* ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "*involved an unreasonable application of* ... clearly established Federal law, as determined by the Supreme Court of the United States." *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000)(emphasis in original).  A state court decision will be contrary to clearly established federal law if the state court applied the wrong legal rule or applies the correct precedent but on facts indistinguishable from a Supreme Court case, reaches a different result. *Id*. at 405-06, 412.  A state court decision is an unreasonable application of clearly established federal law when that decision "correctly

- 5 -

1  identifies the governing legal rule but applies it unreasonably to the facts of a particular
2  prisoner's case." *Id*. at 407-08, 412. For a federal court to find a state court's application of
3  Supreme Court precedent "unreasonable," the petitioner must show that the state court's
4  decision was not merely incorrect or erroneous, but "objectively unreasonable." *Id*. at 409;
5  *Schriro v. Landrigan*, 550 U.S. 465,  473-74 (2007); *Visciotti*, 537 U.S. at 25.

6  Under § 2254(d)(2), the federal court reviews purely factual questions that were
7  resolved by the state court. *Lambert v. Blodgett*, 393 F.3d 943, 978 (9th Cir. 2004).  "[T]he
8  question on review is whether an appellate panel, applying the normal standards of appellate
9  review, could reasonably conclude that the finding is supported by the record."  *Id*.
10 Subsection (d)(2) "applies most readily to situations where petitioner challenges the state
11 court's findings based entirely on the state record.  Such a challenge may be based on the
12 claim that the finding is unsupported by sufficient evidence, ... that the process employed by
13 the state court is defective ... or that no finding was made by the state court at all."  *Taylor
14 v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004) (internal citation omitted), *abrogated on other
15 grounds by Murray v. Schriro,* 745 F.3d 984, 999-1000 (9th Cir. 2014). Under the standard
16 set forth in § 2254(d)(2), habeas relief is available only if the state court decision was based
17 on an unreasonable determination of the facts. *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005)
18 (*Miller-El II*).  A state court decision "based on a factual determination will not be
19 overturned on factual grounds unless objectively unreasonable in light of the evidence
20 presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)
21 (*Miller-El I*); *see Taylor*, 366 F.3d at 999.  In considering a challenge under § 2254(d)(2),
22 state court factual determinations are presumed to be correct, and a petitioner bears the
23 "burden of rebutting this presumption by clear and convincing evidence."  28 U.S.C. §
24 2254(e) (1); *Landrigan*, 550 U.S. at 473-74; *Miller-El II*, 545 U.S. at 240. When applying
25 AEDPA's standards, the federal court reviews the "'last reasoned decision' by a state court
26 addressing the issue at hand."  *Miles v. Ryan,* 713 F.3d 477, 486 (9th Cir. 2012) (citation
27 omitted).  The Court considers, Petitioner's claims in view of these standards.

28

- 6 -

### 2. Ineffective Assistance of Counsel

Criminal defendants are entitled to the effective assistance of counsel under the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To establish ineffective assistance of counsel, a convicted defendant must show (1) that counsel's representation fell below an objective standard of reasonableness, and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 687-88, 694. It is strongly presumed that counsel's performance fell within the "wide range of reasonable professional assistance." *Id.* at 689. Regarding the second component, "a reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694. A claim of ineffective assistance of counsel fails if either prong of the analysis is not met and the petitioner bears the burden of establishing both prongs. *Id*. at 697 ("if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed"); *United States v. Quintero-Barraza*, 78 F.3d 1344, 1348 (9th Cir. 1995).

The test outlined in *Strickland* applies to claims of ineffective assistance of appellate counsel. *See Miller v. Keeney*, 882 F.2d 1428, 1433 (9th Cir. 1989); *United States v. Birtle*, 792 F.2d 846, 847 (9th Cir. 1986). Petitioner bears the burden of showing the state court applied *Strickland* to the facts of his case in an objectively unreasonable manner. *See Bell v. Cone,* 535 U.S. 685, 698-99 (2002).

### C. Application

#### 1. Ground One: Ineffective Assistance of Appellate Counsel

Petitioner contends that appellate counsel was ineffective for not filing a post-verdict motion for new trial based on fabricated evidence regarding placement of the bullet found at the crime scene, Petitioner's DNA found on the bullet, and the movement of the victim's body at the crime scene. Petitioner asserted these grounds in his PCR Petition filed in the state trial court. In denying relief, the trial court first noted that Petitioner had submitted an affidavit from his mother stating she had hired an attorney for the purpose of filing a new

trial motion and asked counsel to delay filing an appeal. (Ex. H, Ruling at 2-3). The trial court found that "the fact that Petitioner's mother paid for a certain service that her son did not receive has ... no bearing on the effectiveness of counsel ... ." The trial court ruled that based on the affidavit of Petitioner's mother, Petitioner had not supported his claim that a motion for new trial should have been filed. (*Id.*). The trial court next found that by the time Petitioner's mother had hired counsel, the time for filing a new trial motion had passed, as Rule 24.1(b) of the Arizona Rules of Criminal Procedure provides that "A motion for new trial shall be made no later than 10 days after the verdict has been rendered." (I*d.*) The verdict in Petitioner's case was returned on February 22, 2008 and counsel filed her notice of appearance regarding an appeal on April 17, 2008. (*Id* ).

Last, the trial court determined that Petitioner had not shown prejudice under the *Strickland* standard because there was no ground on which to base a new trial motion. The trial court commented that the grounds for a new trial under Rule 24.1(c), Ariz. R. Crim. P., are "(1) a verdict contrary to law or to the weight of the evidence; (2) prosecutorial misconduct; (3) juror misconduct; (4) the court's error in the decision of a matter of law or in instructing the jury causing substantial prejudice; and (5) any other reason not due to the defendant's own fault causing an unfair or partial trial." (Ex. H. Ruling at 3). The trial court found as follows:

> The Petitioner simply states that a new trial would have been granted if a Rule 24.1 motion had been brought. Despite this assertion, there is no legal basis provided by Petitioner to suggest that a Rule 24.1 motion was appropriate or would have been granted. This Court has reviewed the record and the pleadings submitted by the parties and has not been able to find *sua sponte* a ground giving rise to a Rule 24.1 motion that would likely be granted. The evidence that was allegedly fabricated was presented to the jury, and the Petitioner had an opportunity, which he took, to inform the jury that the evidence may be questionable. There is no reason to believe the jury's verdict was against the weight of the evidence. Therefore, the Petitioner has failed to meet his burden of showing that he suffered prejudice as required by *Strickland*.

(Ex. H, Ruling at 3-4).

1    The Arizona Court of Appeals "adopt[ed] the [trial] court's ruling and [found] no need
2    to repeat the court's analysis" in the Memorandum Decision. (Ex. B, Mem. Decision). The
3    state trial court's ruling therefore is the last reasoned decision on the issue.

4    As the Court of Appeals for the Ninth Circuit has observed regarding a conviction
5    obtained through the use of false evidence,

> In *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), the Supreme Court explained that "it is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment," and "[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *See also United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (stating that "the Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair"). We have also concluded that a defendant's due process rights were violated, and accordingly granted habeas relief, when it was revealed that false evidence brought about a defendant's conviction. *See, e.g., Killian v. Poole,* 282 F.3d 1204 (9th Cir.2002); *Hall* [*v. Director of Corrections*]*,* 343 F.3d [976] at 978 [(9th Cir. 2003)].

*Maxwell v. Roe*, 628 F.3d 486, 499–500 (9th Cir. 2010). "Under *Napue*, a conviction must be set aside whenever there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Reis-Campos v. Biter,* __ F.3d. __, 2016 WL 4174770, *6 (9th Cir. Aug. 8, 2016).

### (a) Placement of the Bullet (Exhibit 46KK); Petitioner's DNA Found on the Bullet

Petitioner asserted in his state PCR petition with regard to his claim of fabricated evidence that the bullet (Ex. 46KK) was not fired but was placed at its location. He further argued that the DNA material found on the bullet was missed by law enforcement authorities or it was not there at the time the bullet was examined and was subsequently "planted" there. (Ex. F, PCR Pet. at 8-9). Petitioner contended that these issues should have been presented to the state trial court in a motion for new trial. (*Id*.). Petitioner asserts these same claims in his federal habeas petition. (Pet. at 15-18).

During the state court trial, Tucson Police Detective Mark Cassel, a State's witness, testified that he served as the case detective and that during the crime scene search of the

1    residence, he found a spent bullet (Exhibit 46KK) on the living room floor in front of the sofa
2    (between the coffee table and the couch). (Ex. N, R/T 2/15/08 at 44-45; Ex. P, R/T 2/14/08
3    at 113). Detective Cassel arrived at the crime scene residence on February 25, 2006 at
4    approximately 5:09 a.m. and found the bullet between 8:45 a.m. and 9:00 a.m. that same
5    morning. (*Id*., at 47). Detective Cassel alerted the officers who were processing the crime
6    scene, Tucson Police Detectives Kathleen Kelly and Robert Gomez, about the bullet. (*Id*.,
7    at 45).

8    State's witness Detective Kelly testified that at the time the bullet was found, the
9    living room had not been searched. (Ex. P, R/T 2/14/08 at 60). Detective Kelly did not think
10   that the location where the bullet was found was "an impossible place for it to end up" and
11   that someone might have kicked it. (*Id*. at 119). She testified on cross-examination that she
12   did not note in her police report that there was body tissue or skin on the bullet. (*Id*. at 104-
13   05). She also testified on cross-examination that there were no bullet marks or strikes on the
14   north interior wall of the living room, the couch or on the coffee table. (*Id*., at 111, 113).

15   The bullet (Ex. 46KK) was processed by the crime lab for possible DNA. (Ex. N,
16   R/T 2/15/08 at 73). Tony Windsor, a criminalist with the Tucson Police Department,
17   testified that he noticed what appeared to be organic material on the bullet (Ex. 46KK). (Ex.
18   Q, R/T 2/20/08 at 15, 54-55). On cross-examination, Windsor said he noticed the organic
19   material on the bullet on March 14, 2006, the day he photographed it, or earlier. (*Id*., at 71-
20   75, 79-82). Windsor said he collected the bullet as an item of evidence on February 27,
21   2006, examined it on March 7, 2006, and did not make a notation about organic material at
22   that time. (*Id*. at 75-78). Christian Wilson, a criminalist with the Tucson Police Department,
23   testified that the DNA profile obtained from the bullet (Ex. 46KK) matched the DNA profile
24   of Petitioner. (Ex. N, R/T 2/15/08 at 133, 145-47). Wilson removed the trace evidence tissue
25   from the bullet on March 22, 2006 in Windsor's presence. (*Id*. at 156-57).

26   Petitioner's defense counsel called Tucson Police Officer Robert Gamez as a witness
27   who testified that he assisted in processing the crime scene but did not discover the bullet

28

1 marked as Exhibit 46KK (Ex. Q, R/T 2/20/06 at 126-31). Gamez testified he had been
2 through the living room when he learned about the bullet. (*Id*. at 131). Kenton Wong, a
3 forensic scientist from San Francisco, California, testified for the defense that it would be
4 "quite a trick shot" for a person in the doorway of the Lopez residence to have fired the bullet
5 (Ex. 46KK) regarding a deceased person in the laundry room area just off the doorway
6 location. (Ex. R, R/T 2/21/08 at 15-16, 19-33). Wong stated there was no plausible
7 explanation for the bullet coming to rest in the living room area where it was found if fired
8 from the doorway. (*Id*. at 32). Defense counsel argued to the jury during closing argument
9 that the evidence showed that there was no organic material on the bullet on February 25,
10 2006 and that some third person put the organic material on the bullet between March 7-14,
11 2006. (Ex. K, R/T 2/22/08 at 53-63). Defense counsel also argued that the shooting could
12 not have happened from the doorway. (*Id*. at 53-54).

13 As shown by the state court record, the circumstances regarding the location of the
14 bullet (Ex. 46KK) and the recovery of Petitioner's DNA on the bullet were fully developed
15 during the state court trial. Petitioner argued the "fabricated evidence" theory as a theory of
16 defense to the jury. There is no indication in the state record that the prosecution withheld
17 evidence, misled Petitioner regarding the placement of the bullet or as to the DNA evidence,
18 or allowed false evidence to be presented to the jury. The evidence relevant to these two
19 issues is not newly discovered "fabricated evidence" or based on any ground that could have
20 warranted the filing of a motion for new trial.

21 **(b)     Alleged Movement of the Victim's Body at the Crime Scene**

22 Petitioner contended in his state post-conviction petition that a photograph depicted
23 the victim leaning against a washing machine in a small laundry area and another photograph
24 showed the victim lying down on a tan colored rug or carpet, thereby indicating that the
25 victim's body was moved. (Ex. F, PCR Pet., at 9-10). Petitioner cited an April 19, 2007
26 interview with Eric D. Peters, M.D., Pima County Deputy Chief Medical Examiner, who said
27 that the victim was in the kitchen area when he arrived at the scene at approximately 7:00

28

1   a.m. on the date of the incident and that the body should not have been moved. (*Id.*).
2   Petitioner complained in his state PCR petition that the evidence was not presented to the
3   trial court because appellate counsel did not file a new trial motion but had appellate counsel
4   filed the motion Petitioner would have received a new trial. (*Id.*). Petitioner makes the same
5   argument in his federal habeas petition. (Pet., at 18-19).

6   State's witness Ronald Lopez, the victim's brother, lived at the same address in a
7   neighboring unit at the time of the incident. (Ex. M, R/T 2/13/08 at 133). Ronald testified
8   that his brother told him about the fight and then went to his residence. (*Id.* at 138). A short
9   time later, Ronald heard four or five shots, ran to his brother's house, and saw his brother's
10  foot in the kitchen. (*Id.* at 138-41). Ronald identified a photograph of the scene showing
11  how he found his brother in the kitchen and laundry room sitting upright. (*Id.* at 146-47 &
12  State's Ex. 12). Detective Cassel testified that the shooting occurred in the laundry room and
13  kitchen area. (Ex. N, R/T 2/15/08 at 31). Cassel identified State's Exhibit 13 and testified
14  that "if you look at the washing machine that's directly behind the victim" there is a transfer
15  pattern which is "where the blood is ... smeared down, and that's caused from probably blood
16  being on his clothing or part of his body and then moving down the side of the washing
17  machine." (*Id.* at 40).

18  Dr. Peters, the medical examiner who was present at the scene on the morning of
19  February 25, 2006, testified that the scene involved "a kitchen area, kind of an area adjacent
20  to a kitchen with some washing machines." (Ex. P, R/T 2/14/08 at 4, 7). He testified that
21  the first gunshot entered the victim behind his left ear and passed through his brain. (*Id.* at
22  8). The second gunshot entered the victim at the right cheek, passed downward through his
23  throat, and perforated the left lung. (*Id.*). Dr. Peters opined that either wound would have
24  been fatal. (*Id.* at 9).

25  Dr. Peters' testimony appears consistent with the testimony of Ronald Lopez and
26  Detective Cassel that the shooting resulted in the victim's body being in the kitchen-laundry
27  area next to the washing machine. Defense counsel commented during closing argument that

28

at the time of his death, the victim's body was leaning against the washing machine. (Ex. K, R/T 2/22/08 at 74). Petitioner has not shown how evidence of any alleged movement of the victim's body at the crime scene would have changed the jury's verdict. Petitioner does not contend that photographs of the crime scene were not provided prior to trial or that certain photographs were obtained after trial and not disclosed by the State. Petitioner's claim therefore is not based on "fabricated evidence" that could provide the basis of a new trial motion.

### (c) Appellate Counsel Did Not Provide Ineffective Assistance

Petitioner must show that his appellate counsel's performance was objectively unreasonable in failing to provide certain arguments which, in this case, involve the failure to file a motion for new trial in the state trial court. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000). However, appellate counsel is not required to raise meritless claims.. *See Sexton v. Cozner*, 679 F.3d 1150, 1157 (9th Cir. 2012). To succeed on a claim that appellate counsel was ineffective for failing to raise a particular argument, the petitioner must establish that the omitted argument was likely to be successful and therefore that he was prejudiced by its omission. *See Tanner v. McDaniel*, 493 F.3d 1135, 1144 (9th Cir. 2007); *Weaver v. Palmateer*, 455 F.3d 958, 970 (9th Cir. 2006). The inquiry is not whether raising a particular issue would have been frivolous, but whether there is a reasonable probability that raising the issue would have led to the reversal of the petitioner's conviction. *See Miller*, 882 F.2d at 1434.

With respect to Petitioner's three issues described as "fabricated evidence," Petitioner has not shown an omission by appellate counsel in failing to file a motion for new trial or that counsel's failure to file a new trial motion resulted in prejudice so as to deprive him of a fair trial. Petitioner has not demonstrated that the state trial court's ruling in denying post-conviction relief based on these grounds is contrary to or an unreasonable application of Supreme Court precedent. Petitioner is not entitled to habeas relief based on Ground One.

### 2.     Ground Two: Alleged Ineffective Assistance of Trial Counsel

Ground Two is based on Petitioner's claim that trial counsel was ineffective for introducing the Lillian Pillow statements at trial. Petitioner raised this ground in his PCR Petition filed in the state trial court. (Ex. F, PCR Pet., at 12-14). The state trial court ruled as follows in finding that Petitioner had not shown ineffective assistance of counsel or prejudice from counsel's trial tactics:

> Prior to trial, Mr. Evans (defense counsel) filed a Motion to Admit Hearsay Statements of Lillian Pillow. In his motion, he stated that the defense sought to have her statements admitted for the purpose of impeaching Teresa Heber. The statements contained information that the Petitioner was not the shooter and was not wearing similar clothing at the time of the shooting as he was at the club, contrary to Ms. Heber's assertions. The fact that Ms. Pillow was present may also have had the added effect of giving the jury another possible shooter to consider. Introducing evidence that is not perfectly tuned to the defense is not ineffective assistance of counsel - - often, defendants must introduce evidence that is favorable in some ways and deleterious in others. The introduction of these statements is a prime case of trial tactics, and Mr. Evans cannot be said to have been inept, inexperienced, or unprepared simply by their introduction. Furthermore, because of the weight of the evidence against the Petitioner, it cannot be said that but for the introduction of the evidence he would not have been convicted. Based on these findings, the Petitioner has failed to establish either that he received ineffective assistance of trial counsel or that he was prejudiced by the trial tactics.

(Ex. H, 12/10/10 Ruling at 6). Petitioner raised this issue in seeking review before the Arizona Court of Appeals which denied relief based on its adoption of the trial court's ruling. (Ex. B, Mem. Decision). The trial court's ruling is the last reasoned decision on the issue.

The state court record shows that on July 30, 2007, defense counsel filed a Motion to Admit Hearsay Statements of Lillian Pillow. (Ex. L, Motion). Defense counsel sought the admission of Ms. Pillow's statements to impeach the testimony of Teresa Huber who had told detectives that immediately after hearing gunshots, she saw a hand holding a gun in the doorway of the victim's home and that the person with the gun was wearing a black sweater similar to the one Petitioner was seen wearing earlier that evening. (*Id*.). The State had notified defense counsel that Ms. Pillow's whereabouts were unknown. (*Id*.). As argued in the Motion, during the crime scene investigation, officers observed shoe prints walking

1 toward and away from the door and these shoe prints matched Ms. Pillow's shoes.  (*Id*.).
2 During an interview with authorities on February 26, 2006, Ms. Pillow denied being at the
3 victim's residence at any time.  (Id.).  During an interview with detectives on February 28,
4 2006, Ms. Pillow first said she was at the victim's home but did not observe the shooting or
5 hear any gunshots.  (*Id*.).  During the same interview, Ms. Pillow then provided a different
6 version of events, stating she had gone to the victim's home on the night of the shooting to
7 fight Latisha Lux with whom she had had a fight earlier that evening at the VFW.  (*Id*.). Ms.
8 Pillow said she witnessed the shooting but did not participate in it.  (*Id*.).  As further
9 proffered in the Motion, on February 27, 2006, during telephone calls to her family from the
10 Pima County Jail, Ms. Pillow stated that she got into a fight with Latisha Lux but did not see
11 the person who shot the victim and that she was willing to tell the authorities anything to get
12 out of jail.  (*Id*.).

13 During trial, State's witness Teresa Heber testified that she probably talked to the
14 police about this case but she did not recognize her voice when a tape recorded interview was
15 played in court before the jury.  (Ex. N, R/T 2/15/08 at 119-25).  Ms. Heber testified on
16 cross-examination that she did not remember an altercation between Petitioner and the victim
17 at the bar but she did recall the victim being on the floor and blood.  (*Id*. at 126-27)
18 Petitioner's defense attorney admitted video recordings of the Pillow interviews and an audio
19 recording of the Pillow conversations based on the parties' stipulation.  (Ex. Q, R/T 2/20/08
20 at 138-40; Ex. R, R/T 2/21/08 at 3-10, 14-15 [the video and audio recordings have not been
21 provided as part of the state court record in this case as part of the state court record]).

22 During closing argument, the prosecutor commented that Ms. Heber had said on the
23 tape recording that Petitioner and the victim got into a fight that evening. (Ex. K, R/T
24 2/22/08 at 14-16).  Ms. Heber told the police that she saw a hand in the doorway, that she
25 recognized the black velvety material that Petitioner had been wearing that evening, and that
26 she did not see his face but she knew it was Petitioner who shot the victim.  (*Id*. at 17-18, 19-
27 20).  Ms. Heber also said that Petitioner was the "first in through the door."  (*Id*. at 17).

28
- 15 -

1    Defense counsel commented during closing argument that the authorities "coached"
2 Lillian Pillow during her interviews to say Petitioner was involved in the shooting but it was
3 in fact Pillow who was involved, noting her footprints at the scene. (Ex. K, R/T 2/22/08 at
4 64-68; see also Ex. K, R/T 2/22/08 at 24-25, 27-29, 98-100 regarding the prosecutor's
5 closing argument concerning Pillow's statements that she changed her "story" several times
6 but said Petitioner "did it.").

7    As the record shows, defense counsel admitted Ms. Pillow's statements to impeach
8 Ms. Heber's statement to the police that she recognized Petitioner as the shooter, to show that
9 the authorities sought to implicate Petitioner by "coaching" Ms. Pillow, and to show that Ms.
10 Pillow had given inconsistent statements to the authorities and she was in fact the person who
11 shot and killed the victim. Petitioner's challenge to defense counsel's decision to present Ms.
12 Pillow's statements as part of the defense theory amounts to a disagreement with counsel's
13 trial tactics. An attorney's tactical decisions about how to present a defense are not subject
14 to an ineffective assistance of counsel attack. *Wildman v. Johnson,* 261 F.3d 832, 839 (9th
15 Cir.2001)("disagreement with trial counsel's tactical decision cannot form the basis for a
16 claim of ineffective assistance of counsel"). *See also Strickland,* 466 U.S. at 697–90 (mere
17 criticism of trial tactics is not sufficient to support a charge of ineffective assistance of
18 counsel); *Gustave v. United States,* 627 F.2d 901, 904 (9th Cir.1980) ("Mere criticism of a
19 tactic or strategy is not in itself sufficient to support a charge of inadequate representation").

20    Petitioner's contention that counsel's trial strategy was prejudicial because Ms. Pillow
21 ultimately told the authorities that Petitioner shot the victim (Pet. at 21-22), overlooks Ms.
22 Pillow's several contradictory statements, her attempts to distance herself from the crime, and
23 the presence of her shoe prints at the scene. In determining whether the defendant received
24 effective assistance of counsel, '[the court] will neither second-guess counsel's decisions, nor
25 apply the fabled twenty-twenty vision of hindsight,' but rather, will defer to counsel's sound
26 trial strategy." *Murtishaw v. Woodford,* 255 F.3d 926, 939 (9th Cir. 2001) (quoting
27 *Strickland,* 466 U.S. at 689). "Because advocacy is an art and not a science, and because the

28

- 16 -

1 adversary system requires deference to counsel's informed decisions, strategic choices must
2 be respected in these circumstances if they are based on professional judgment." *Strickland,*
3 466 U.S. at 681.

4 While the State's evidence indicated that the victim was shot with two different guns
5 (Ex. K, R/T 2/22/08 at 10-13), other evidence presented by the State implicated Petitioner
6 as the person who shot and killed the victim. Petitioner's blood was found on the porch of
7 the residence where the victim was shot. (Ex. N, R/T 2/15/08 at 147 referring to Ex. 20KK;
8 Ex. K, R/T 2/22/08 at 6-7). State's witness Floyd Lee, who was in a pod with Petitioner at
9 the Pima County Jail, testified that after Petitioner made a phone call, Petitioner told him that
10 a woman had changed her statement. (Ex. N, R/T 2/15/08 at 86-92). Petitioner also told Lee
11 that he had gotten into a fight with the victim at the VFW night club and later "went to where
12 Michael Lopez was and shot him several times." (*Id.* at 92-93).

13 Based on these circumstances, Petitioner has not shown that defense counsel's trial
14 strategy constituted error or was so prejudicial that it deprived him of a fair trial. Petitioner
15 has not shown that the state trial court's ruling denying his ineffective assistance of trial
16 counsel claim amounts to an unreasonable determination of the facts or an unreasonable
17 application of clearly established federal. Ground Two asserted in the Petition does not
18 provide a basis for relief.

### III. Conclusion and Denial of Certificate of Appealability

20 Based on the foregoing, Grounds One and Two asserted in the Petition do not provide
21 a basis for federal habeas relief.

22 Before Petitioner can appeal this Court's judgment, a certificate of appealability must
23 issue. See Fed. R. App. P. 22(b)(1) (the applicant cannot take an appeal unless a circuit
24 justice or a circuit or district judge issues a certificate of appealability under 28 U.S.C. §
25 2253(c)). The standard for issuing a certificate of appealability ("COA") is whether the
26 applicant has "made a substantial showing of the denial of a constitutional right." 28 U.S.C.
27 § 2253(c)(2). Where, as here, the "district court has rejected the constitutional claims on the

merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Upon review of the record in light of the standards for granting a certificate of appealability, the Court concludes that a certificate shall not issue as the resolution of the petition is not debatable among reasonable jurists and does not deserve further proceedings.

Accordingly,

**IT IS ORDERED** that the Petition Under 28 U.S.C. § 2254 For A Writ of Habeas Corpus By A Person In State Custody (Non-Death Penalty) (Doc. 1) is denied and dismissed with prejudice.

**IT IS FURTHER ORDERED** that a Certificate of Appealability is DENIED and shall not issue.

The Clerk of Court is directed to enter judgment accordingly and close the file in this matter.

DATED this 28th day of September, 2016.

*[signature]*

**CHARLES R. PYLE**
UNITED STATES MAGISTRATE JUDGE